AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

United States of America )
v. )
MICHAEL W. FRANZENBURG )  Case No.  11-8138-JMH
JOSEPH A. GRIZZANTI )
KENNETH E. FOOTE, JR. )
)
)
*Defendant(s)*

FILED by _____ D.C.
MAY - 5 2011
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __7/2009 to 3/2010__ in the county of __Palm Beach County__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code Section 1349 | conspiracy to commit mail fraud |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
Complainant's signature

Special Agent Paul Wackes, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/5/11

_____
Judge's signature

City and state:  West Palm Beach, Florida   U.S. Magistrate Judge James M. Hopkins
*Printed name and title*

# AFFIDAVIT

## A. INTRODUCTION

I, Paul C. Wackes, having first been duly sworn, do hereby state the following:

1. I am a Special Agent with the FBI assigned to the Miami, Florida Field Division, in the Palm Beach County Resident Agency. I have been a Special Agent with the FBI for 19 years. I have been assigned to investigations involving economic crimes for approximately 16 years. I am an attorney, and I practiced law in the Fort Lauderdale, Florida, area for approximately five years prior to my employment with the FBI. As a Special Agent with the FBI, I have personally conducted, supervised, and participated in investigations that have resulted in the arrest and conviction of individuals responsible for violating the federal laws of the United States, including violations of Title 18 of the United States Code (USC) involving mail and wire fraud. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, USC Section 2510 (7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, USC Sections 1341 and 1349.

2. The following information is based on my personal knowledge, discussions with fellow agents, interviews, review and analysis of financial records, and the review of tapes and transcripts of consensually monitored telephone calls and meetings. Where the statements of others are related herein, they are related in substance and in part and not verbatim. This Affidavit is being prepared only for the purpose of establishing probable cause to obtain a criminal complaint and arrest warrants

for subjects **MICHAEL WERNER FRANZENBURG, JOSEPH ARTHUR GRIZZANTI, and KENNETH EDWIN FOOTE, JR.** Therefore, it does not contain all of the information known to me concerning the offense.

**B.   FACTS**

**Evidence of Mail Fraud**

3.   Our investigation has shown that between on or about July 2009, until on or about March 2010, in Palm Beach County, within the Southern District of Florida and elsewhere, **MICHAEL WERNER FRANZENBURG, JOSEPH ARTHUR GRIZZANTI, and KENNETH EDWIN FOOTE, JR.**, and others known and unknown, doing business as International Resort Solutions LLC (hereinafter "IRS"), and operating from Lake Worth and West Palm Beach, Florida, conducted a telemarketing timeshare scheme targeting timeshare[1] owners throughout the United States and Canada.

4.   IRS was a Florida limited liability company whose Articles of Organization were filed with the Florida Department of State, Division of Corporations, on July 28, 2009, and was the business name under which the defendants and others operated a purported timeshare marketing service. Defendant **MICHAEL FRANZENBURG** was the listed Vice-Operating Manager of IRS and the sole authorized signer on the IRS bank accounts. Throughout the course of the scheme, IRS claimed that its principal place of business was 1951 10th Avenue North, Lake Worth, Florida ("Lake Worth office"), and that address appeared in its website, in correspondence, and in other documents

---

[1] As used in this affidavit, "timeshare" refers to a type of fractional interest in real estate in which the owner has the right to occupy particular premises for a specified period of time. What constitutes a "timeshare" depends upon the law of the state in which the real estate is located.

distributed to clients that I have reviewed. However, based upon interviews of former IRS employees, IRS moved from that location after a few months of operation to another location at 1489 N. Military Trail, Suite 112, West Palm Beach, Florida ("West Palm Beach office"). In an interview I conducted of **FRANZENBURG**, he said that IRS relocated to the West Palm Beach office because he was concerned that the Lake Worth office was "hot" since it had previously been occupied by Universal Marketing Solutions, another fraudulent timeshare business. Because **FRANZENBURG** had not obtained the required telemarketing license for IRS, he wanted to avoid any encounters with the State and therefore moved to the West Palm Beach office. However, **FRANZENBURG** continued to pay rent and receive mail at the Lake Worth office.

5.   IRS had at least four separate boiler rooms located in West Palm Beach. According to interviews of IRS employees, the telemarketers who worked at the boiler rooms would contact timeshare owners throughout the United States and Canada to induce them to pay up-front fees for purported marketing and sales services. When contacting the timeshare owners, the telemarketers would routinely make false and fraudulent representations concerning IRS's services, including falsely stating that IRS already had buyers for their timeshares, that IRS had closings scheduled for their timeshares, and/or that IRS would actively market their timeshares to potential buyers. None of these statements was true. Indeed, during the entire time IRS was open, they did not locate a single timeshare buyer, sell a single timeshare for their customers or actively market a single timeshare. Nonetheless, IRS telemarketers demanded up-front fees from the timeshare owners typically ranging from $999 - $2,996 purportedly for closing and/or marketing costs. In most instances, the timeshare owners paid the up-front fees by providing their credit card information over the telephone. The payments were typically processed the next day by a merchant account used by

IRS. During the 9 month period that IRS was in operation, telemarketers contacted more than 2,000 victims throughout the United States and Canada and induced them to pay IRS more than $4.9 million for marketing and sales services which were never provided.

6. Interviews I have conducted of former IRS employees have revealed that on or about July or August 2009, **JOSEPH ARTHUR GRIZZANTI** began working as a manager for an IRS boiler room located in the vicinity of Okeechobee Road and Military Trail in West Palm Beach, Florida. As the manager, **GRIZZANTI's** responsibilities included the oversight of the telemarketers who worked in that office. **GRIZZANTI** was an experienced telemarketer, having previously worked for Creative Vacation Solutions, another fraudulent timeshare telemarketing company. After a few weeks, **GRIZZANTI** moved on to work at the IRS main office with **FRANZENBURG**. While at the IRS main office, **GRIZZANTI's** job included keeping track of the sales generated by and the payments made to the IRS boiler rooms.

7. Interviews I have conducted of former IRS employees have revealed that **KENNETH EDWIN FOOTE, JR.** was a manager with **GRIZZANTI** of the IRS boiler room on Okeechobee Road and Military Trail. In addition to having the same managerial responsibilities as **GRIZZANTI**, **FOOTE** also spoke on the telephone to timeshare owners and made false and fraudulent representations to them. After **GRIZZANTI's** move to the IRS main office, **FOOTE** became the sole manager of this boiler room.

8. I have reviewed approximately 200 written statements from timeshare owners who paid IRS an up-front fee and received no services. These written statements identified that the sales pitches used by the IRS telemarketers, including those who worked at Grizzanti's and Foote's boiler room, contained material misrepresentations of fact and misleading statements to them, including the

following:

A. IRS telemarketers falsely represented that IRS had received an offer on their time share. This claim was sometimes embellished by individual IRS telemarketers to include multiple offers on the property. In addition, many individuals were also told that the person who made the offer to purchase had already made a non-refundable down-payment;

B. IRS telemarketers falsely represented that a closing was scheduled on the property on a specific date typically thirty to ninety days hence; and

C. IRS telemarketers falsely represented that the fees were for deed and title searches, as well as other costs associated with closing, and that the fees were fully refundable once closing occurred.

9. Contrary to what individuals were told, investigation has shown that IRS never located a single buyer for any timeshare property, and that the closing date was therefore made up by the telemarketer. This made up closing date was typically up to ninety days from the date of the call. The purpose of the delayed closing date was to postpone when customers would call their credit card companies or banks to complain that they had been defrauded, an inevitable result from their supposed "closing" dates having come and gone without the client receiving the sales proceeds check they had been promised. Delaying that inevitable reporting by the client was important to the success of the scheme, since customer complaints would almost certainly result in charge backs against the merchant account being utilized by IRS, and thus jeopardize the ability of IRS to get paid.

10. Despite billing over $4.9 million for purported timeshare resale services, IRS did not sell a single timeshare. Interviews conducted have revealed that IRS had no employees on its staff whose task it was to find buyers for their customers' timeshare interests. They made no telemarketing calls

specifically to find buyers for their clients' timeshares. IRS made no efforts to either market or advertise any customer's timeshare interest other than a simple listing on IRS' website which was made at nominal expense. IRS made no substantial efforts to promote its website and a listing on IRS' website was of no practical value to IRS' customers.

11.     One of the victims, who has been interviewed, was a victim identified by his initials "J.O." This victim's interview, and as well as records obtained from him and from Federal Express, reveals the following:

     A. On or about September 30, 2009, an IRS telemarketer, in a telephone call with J.O., represented that IRS had a buyer ready to purchase J.O.'s Bay and Beach Club timeshare located in Florida.  The IRS telemarketer solicited $2,996 in up front fees for this service.

     B. On or about September 30, 2009, a credit card charge in the amount of $2,996 was made to J.O.'s credit card by Sunshine Industrial Products, which was the merchant account utilized by IRS.

     D. On or about October 1, 2009, IRS caused the delivery of a parcel via Federal Express to J.O. in Selden, New York, which contained an IRS contract that was inconsistent with the representations that had been made to J.O. by the IRS telemarketer.

     E. On or about October 6, 2009, IRS again sent the above IRS contract to J.O. via facsimile from IRS telephone number (561) 904-6653 in West Palm Beach, Florida, to J.O.'s telephone number (631) 732-7427, in Selden, New York.

12.     I have also obtained IRS bank records. A review of these bank records has revealed that after the credit card processing fees were paid, IRS received over $3.3 million in proceeds based upon victim checks, cash deposits, and wire transfers.  From July 2009, through February 2010,

**FRANZENBURG** was paid $81,900 and his spouse was paid $66,501 in IRS checks as distributions from the business; **GRIZZANTI** was paid $59,439, his spouse was paid $9,000, and his company, Little G's Marketing, Inc., was paid $40,805 in IRS checks as distributions from the business; **FOOTE** was paid $92,436 in IRS checks as distributions from the business; and a company in which **GRIZZANTI** and **FOOTE** were the only listed principals, JK Marketing Solutions, Inc., was paid $28,029 in IRS checks as distributions from the business. Interviews conducted of IRS employees have revealed that, in addition to these IRS checks, **FRANZENBURG** and **GRIZZANTI** also received significant amounts of cash resulting from the cashing of IRS checks by other IRS employees.

**C.   CONCLUSION**

13.   Based on the above facts, Affiant asserts that there is probable cause to believe that subjects **MICHAEL WERNER FRANZENBURG, JOSEPH ARTHUR GRIZZANTI, and KENNETH EDWIN FOOTE, JR.** did knowingly and willfully combine, conspire, confederate and agree among themselves and each other to devise a scheme and artifice to defraud and to obtain money and property by means of false pretenses, representations and promises, and for the purpose of executing the scheme, and attempting so to do, to knowingly cause to be sent and delivered by Federal Express, mail matter to J.O. and to other residents of the United States, from IRS' offices in Palm Beach County, Florida, in violation of Title 18, United States Code, Section 1341, all in violation of Title 18, United States Code, Section 1349. Therefore, Affiant requests the court find probable cause and issue warrants to arrest **MICHAEL WERNER FRANZENBURG, JOSEPH ARTHUR GRIZZANTI, and KENNETH EDWIN FOOTE, JR.**

FURTHER YOUR AFFIANT SAYETH NAUGHT

_____
Paul C. Wackes, Special Agent, FBI

Sworn to me this
__5__ day of __May__ 2011

_____
James M. Hopkins
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 11-8138-JMH

### BOND RECOMMENDATION

DEFENDANT: MICHAEL W. FRANZENBURG

$50,000 Personal Surety
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Adrienne Rabinowitz

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s): FBI- SA Paul Wackes
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 11-8138-JMH

### BOND RECOMMENDATION

DEFENDANT: JOSEPH A. GRIZZANTI

$50,000 Personal Surety
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Adrienne Rabinowitz

Last Known Address: _____

What Facility: _____

Agent(s): FBI- SA Paul Wackes
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NUMBER: 11-8138-JMH

### BOND RECOMMENDATION

DEFENDANT: KENNETH E. FOOTE, JR.

$50,000  10% Bond
(Personal Surety) (Corporate Surety) (Cash) (Pre-Trial Detention)

By: _____
AUSA: Adrienne Rabinowitz

Last Known Address: _____

_____

_____

What Facility: _____

_____

Agent(s): FBI- SA Paul Wackes
(FBI)   (SECRET SERVICE)   (DEA)   (IRS)   (ICE)   (**OTHER**)